IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| C.M., by and through his next friend, | ) | |
| Tracy Marshall, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-591-WKW |
| | ) | [WO] |
| ROBERT J. BENTLEY, M.D., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs C.M., A.Q., S.G., R.A., J.S., J.R., L.M, and K.R., all minors suing by and through next friends, bring this action against Defendants Governor Robert J. Bentley, State Superintendent of Education Dr. Thomas R. Bice, State Commissioner of Revenue Julie P. Magee, and State Comptroller Thomas L. White, Jr., for declaratory and injunctive relief.   In a facial challenge, Plaintiffs allege that the Alabama Accountability Act ("the AAA") violates their right to equal protection under the Fourteenth Amendment.   Defendants move to dismiss Plaintiffs' complaint on the grounds that Plaintiffs lack standing and that the case is unripe.   Defendants contend that even if Plaintiffs meet jurisdictional requirements, they fail to allege a violation of the Equal Protection Clause.   Additionally, Governor Bentley argues that he is not a proper defendant.

The motion to dismiss has been fully briefed and argued orally.  (*See* Docs. # 26, 31, 34, 35.)  Upon careful consideration of the helpful arguments of counsel, the relevant law, and Plaintiffs' allegations, the court finds that the motion is due to be granted for failure to state a claim upon which relief can be granted.

## I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  The parties do not contest personal jurisdiction or venue.

## II.  STANDARDS OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction.  *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).  On a Rule 12(b)(1) facial attack, the court evaluates whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction" in the complaint and employs standards similar to those governing Rule 12(b)(6) review.  *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335 (11th Cir. 2013).

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

## III. BACKGROUND

To place the background in context, an abridged version of Plaintiffs' contentions is important. This is a facial challenge to the AAA; this is not a disparate impact case. No suspect class is involved, but a discrete classification is. The discrete classification upon which Plaintiffs rely is variously stated as those students who cannot afford to escape failing schools (based upon financial circumstances and distance from a participating nonfailing school), or those students who are unable to access a governmental benefit for the same reasons. The cause of the alleged disparity is the AAA's requirement that certain students bear the costs of transportation to transfer from their failing school to a nonfailing school, a potentially disabling factor for many students residing in the largely poor and rural Black Belt region of Alabama. Plaintiffs' complaint is with the terms on which the AAA provides access to nonfailing schools.

Plaintiffs admit there is presently no fundamental right to an effective public education, and that the AAA did not cause the failing schools. The issue of a

fundamental right to some minimal quantum of education is in play only for purposes of evaluating the level of judicial scrutiny of Plaintiffs' equal protection claim.  There is no stand-alone constitutional claim arising from the State's denial of a right to receive a nonfailing public education.

The injury alleged is purely an equal protection denial:  Plaintiffs suffer unequal treatment.  The requested remedy is arguably mean:  Withdraw benefits from those students who can afford to escape failing schools.  The only remedy requested thus far would leave Plaintiffs in exactly the same situation to which they are currently subject, but with the company of their better-situated classmates. The equal treatment requested is, in effect, equally bad treatment.

## A.    The Alabama Accountability Act of 2013

### 1.    *Enactment*

On February 14, 2013, the Alabama House of Representatives passed H.B. 84, which later became the AAA.  The original bill allowed local school systems to seek waivers from certain State Department of Education requirements in order to implement creative educational programs.  On February 28, 2013, the State Senate passed an amended version of H.B. 84.  A conference committee convened to reconcile the two versions of the bill.  Plaintiffs allege that the Republican majority members of the committee conferred without the two minority members, added

nineteen pages of new text to the proposed law, and named it the Alabama Accountability Act of 2013.

The revisions to the legislation included provisions defining "failing schools" and authorizing parents of children in failing schools to transfer to nonfailing public and "nonpublic" – *i.e.*, private – schools. The new provisions authorized the issuance of refundable state income tax credits of roughly $3,500 to parents transferring children from failing schools, directed the Alabama Department of Revenue to divert funds from the State's Education Trust Fund ("ETF") to pay the credits, and authorized individual and corporate income tax credits up to a combined $25,000,000 for student participants in a new scholarship program. The conference revisions to the bill were passed in both the House and Senate on the same day, and the Governor signed the AAA into law on March 14, 2013. The legislature later amended the law's definition of "failing schools" and added provisions for schools and school systems to refuse students seeking transfer from failing schools. The amended version of the AAA was signed into law on May 20, 2013.

### 2. *Details*

The AAA defines "failing school" as

[a] public K-12 school that is one or more of the following:

a.  Is labeled as persistently low-performing by the State Department of Education, in the then most recent United States Department of Education School Improvement Grant application.

b.  Is designated as a failing school by the State Superintendent of Education.

c.  Does not exclusively serve a special population of students and, until June 1, 2017, has been listed three or more times during the then-most recent six years in the lowest six percent of public K-12 schools on the state standardized assessment in reading and math or, on or after June 1, 2017, has, during the then-most recent three years, earned at least one grade of "F" or, during the then-most recent four years, earned at least three grades of "D" on the school grading system developed pursuant to Section 16-6C-2.  In the event sufficient rules required to implement the grading system provided for by Section 16-6C-2, have not been implemented pursuant to the Alabama Administrative Procedure Act in time to provide a sufficient record to implement this subdivision by June 1, 2017, then a failing school shall be a school that has been listed in the lowest 10 percent of public K-12 schools in the state standardized assessment in reading and math.

Ala.  Code  § 16-6D-4(3).[1]     "To  provide  educational  flexibility  and  state accountability for students in failing schools," the AAA authorizes the payment of "an Alabama income tax credit to a parent of a student enrolled in or assigned to attend a failing school to help offset the cost of transferring the student to a nonfailing public school or nonpublic school of the parent's choice."  *Id*. at § 16-6D-8(a)(1).  A parent who elects to send a child to a nonpublic school may not

---

[1] The court suggested at oral argument, and the parties agreed, that there would always be "failing" schools under the AAA because there would always be schools ranked in the bottom six percent for standardized test scores, no matter how excellent schools really are.  Defendants clarify that they mistakenly agreed with the court's proposition.  (Doc. # 43.)  They point out that the AAA limits the classification of the bottom six percent of schools as failing "until June 1, 2017."  Ala. Code § 16-6D-4(3)(c).  After June 1, 2017, the AAA provides that "failing" schools will be defined as failing pursuant to a school grading system set out in § 16-6C-2.  *Id.*

receive tax credits for the tuition and mandatory fees paid to the nonpublic school unless the nonpublic school participates in a separate scholarship program created by the AAA, discussed *infra*. *See id.* at § 16-6D-4(9) (defining nonpublic schools as private schools participating in and complying with the requirements of the scholarship program). Nonpublic schools that comply with the AAA and participate in the scholarship program are also subject to various "academic accountability standards." *Id.* at § 16-6D-9(c)(2)

Plaintiffs represent that the value of the tax credit is approximately $3,500. They arrive at this figure because the AAA provides that the tax credit shall be for an amount equal to eighty percent of the average annual state cost of attendance for a public K-12 student during the relevant tax year or the actual cost of attending a nonfailing public school or nonpublic school, whichever is less. Ala. Code § 16-6D-8(a)(1). "Actual cost" is calculated by adding together any tuition amounts or mandatory fees charged by the school as a condition of being enrolled. *Id.* Thus, if a parent takes advantage of the AAA by transferring his or her child to a nonpublic school and receives the tax credit, the child's failing school retains the remaining twenty percent of state funds "for as long as the parent receives the tax credit," even though the failing school no longer bears the expense of educating the child who transferred. *See id.*

If the transferring student's parent's income tax liability is less than the credit allowed by law, the parent is entitled to a refund or rebate equal to the balance of the unused credit. *Id.* The tax credit does not cover the expense of transportation incurred by a parent who elects to transfer his or her child from a failing school to a participating nonfailing public or private school. Of critical importance, if the nearest nonfailing school is a public school in another school system, or, if the parent chooses to send the child to a nonpublic school, the parent bears the cost of transportation. Ala. Code § 16-6D-8(b)(8). But if the child transfers to a nonfailing school within his local school system, "transportation costs to the nonfailing public school [are] the responsibility of the local school system." *Id.* Admittedly, the AAA's transportation scheme is most useful to and least burdensome for families with broad public school choice offerings within their local school system.

The AAA also creates a scholarship program whereby individual taxpayers may receive tax credits, up to a fixed limit, for total contributions made to scholarship granting organizations during a particular tax year. Ala. Code § 16-6D-9(a)(2). The law further authorizes tax credits to corporate taxpayers for scholarship donations, also subject to certain limits. *Id.* at § 16-6D-9(a)(3). The AAA imposes various "administrative accountability standards" upon scholarship granting organizations. *Id.* at § 16-6D-9(b)(1). One requirement is that

scholarship granting organizations must "[e]nsure" that scholarship assistance goes "only to students who would otherwise attend a failing school so that the student can attend a nonpublic school or a nonfailing public school." *Id.* at § 16-6D-9(b)(1)(m). But after September 15th of each year, scholarship funds may be granted to other "low-income eligible students to defray the costs of attending a qualifying school,"[2] regardless of whether those students are escaping failing schools. *Id.* Hence, scholarships unclaimed by families departing from failing schools may be granted to other qualified families.

There is one final relevant detail of the AAA: It provides that nonfailing public and nonpublic schools are not required by law to receive any student seeking to take advantage of the AAA by leaving a failing public school. *See* Ala. Code § 16-6D-8(d)(1). The AAA authorizes public schools, school systems, school districts, and nonpublic schools to develop "terms and conditions" under which they will allow students to transfer from failing schools; the law requires that these entities not discriminate "on the basis of the race, gender, religion, color, disability status, or ethnicity of the student or of the student's parent." *Id.* at § 16-6D-8(d)(2).

---

[2] "Qualifying schools" can be either public or private and are defined at Ala. Code § 16-6D-3(11).

**B.**    <u>Some Consequences of the AAA</u>

Plaintiffs represent that the AAA dis-incentivizes nonfailing public schools from receiving transfer students from failing schools because nonfailing public schools naturally wish to minimize their risk of becoming failing schools.  Many schools and school systems have announced that they will not accept transfer students from outside their district.  And many of the schools and school systems which are refusing to accept transfer students "are adjacent to school systems in which all the public schools (or, in smaller systems, the only public school) serving a particular grade or grades are failing."  (Doc. # 1, at 11, ¶ 35.)  Moreover, Plaintiffs claim that very few nonpublic schools have chosen to comply with the AAA's scholarship program requirements, which has left students in rural areas with even fewer options for transfer.[3]  Thus, many students in failing schools seeking to transfer must travel long distances to reach nonfailing public schools or nonpublic schools which will admit them.

Plaintiffs further allege that the AAA negatively impacts the financial position of all public schools, which stand to lose funding as funds are depleted from the ETF to fund tax credits to parents who transfer children to nonfailing schools.  And, further, the schools labeled as failing will continue to struggle to excel because students transferring to nonpublic schools take with them, in the

---

[3] Plaintiffs report that fifty-eight nonpublic schools in Alabama participate at present. (Doc. # 34, at 14.)

form of a tax credit, eighty percent of the funding allocated to the school per student.  (*See* Doc. # 1, at 2, ¶ 3 ("The schools in which Plaintiffs are trapped are likely to deteriorate further as their funding is continually diminished over time as a result of the [AAA].  All public schools, whether labeled failing or not, will suffer a reduction in resources, making it more difficult for them to continue to perform at the same level.").)[4]

## C.   <u>Plaintiffs' Particular Plight</u>

Plaintiffs aver that seventy-eight public schools in Alabama were officially designated as failing per the AAA.  Not surprisingly, these failing schools serve some of the state's poorest students.  Plaintiffs claim that thirty of the seventy-eight failing schools are located in the "ten counties comprising Alabama's Black Belt," which have historically low income and high unemployment.[5]  (Doc. # 1,

---

[4] If a student leaves a failing school for a nonfailing *public* school, one hundred percent of the State's funding per pupil follows that student to his new school.  The twenty percent partial-funding situation occurs only when a student leaves a failing school for a private school.

Defendants admit that the AAA requires the State to divert funds from the ETF to a new fund for payment of parent tax credits.  But they point out that even when a parent takes advantage of the AAA and transfers his or her child to a nonpublic school, thereby becoming entitled to an AAA-created tax credit, "the student's old, failing school will be allocated [twenty] percent of the State's average yearly cost for educating a public school student.  By the complaint's logic, this amount allocated to the failing school is $875."  (Doc. # 31, at 16 (citations omitted).)  Defendants explain that a failing school thus will receive more money per pupil if some of its students transfer to nonpublic schools.  (*See* Doc. # 31, at 16.)  Plaintiffs do not challenge Defendants' math in the opposition briefing, but they explain that other significant sources of funding from the federal government are lost when failing public schools lose students to private schools.

[5] The number of counties within Alabama's Black Belt is, by other accounts, more than ten.  The Black Belt is "a south-central region of the State named for its black soil.  A large black

at 12, ¶ 39.)   The high concentration of failing schools in Black Belt counties leaves students assigned to those failing schools with few nonfailing public school options when compared to students in failing schools in more populous or more economically prosperous parts of Alabama.  Plaintiffs are all students in failing schools in the Black Belt with few or no nearby nonfailing school options and no financial resources with which to access nonfailing schools.

### 1.      *C.M., A.Q., and S.G.*

Plaintiffs C.M., A.Q., and S.G. are "trapped" in Wilcox County's sole public middle school, Camden School of Arts & Technology, which has been designated as failing.  (Doc. # 1, at 14.)  C.M. and A.Q. "struggle" academically, and S.G. has had "critically low" grades.  (Doc. # 1, at 15–16, ¶¶ 44, 47, 54.)  C.M., A.Q., S.G., and their parents all desire that C.M., A.Q., and S.G. excel in school but complain that Camden School of Arts & Technology lacks resources and adequately trained faculty to help them succeed academically.

C.M., A.Q., and S.G. assert that the closest nonfailing public school to which they could transfer is Thomasville Middle School in Clarke County, approximately thirty-four miles from their assigned school and thirty-three miles from their homes.  Transferring to Thomasville Middle School would require their parents to commute roughly 120 miles total each day.  The next closest nonfailing

---

population resides there because of a history of agriculture and slavery."  *Ala. Legislative Black Caucus v. Alabama*, ___ F. Supp. 2d ____, 2013 WL 6925681, at *8 (M.D. Ala. 2013).

public middle schools are in Dallas and Lowndes Counties, thirty-six and forty-nine miles away, respectively.  C.M., A.Q. and S.G.'s parents complain that they are either completely unable to transport their children or that they would suffer substantial economic hardship to transport their children that many miles each day, five days a week.

Alternatively, C.M., A.Q., and S.G. could enroll in "the least expensive private school within thirty miles" of their assigned school – Wilcox Academy. (Doc. # 1, at 20, ¶ 70.)  Wilcox Academy reportedly costs $180 per month, exclusive of mandatory fees and incidental costs.  C.M., A.Q., and S.G. could not afford the cost of tuition, but even if they could, their parents would not be eligible for a tax credit to reimburse the costs because Wilcox Academy is not participating in the AAA's scholarship program.  Thus, C.M., A.Q., and S.G. complain that they are "trapped" in Camden School of Arts & Technology "without meaningful access to a minimally adequate education."  (Doc. # 1, at 21, ¶ 72.)

### 2.    *R.A. and J.S.*

Plaintiffs R.A. and J.S. are both middle school students assigned to attend the only public middle school in Russell County's school system, Russell County Middle School, which is a failing school.  R.A. struggles academically and has failed several subjects.  J.S. has difficulty reading and is repeating eighth grade at his mother's request, even though Russell County School tried to promote J.S. to

high school.  Both R.A. and J.S. complain that the school and its teachers are inadequate to help them achieve academically.

R.A. could transfer to Phenix City Intermediate School, a public school operated by the Phenix City Board of Education serving sixth and seventh graders. Phenix City Intermediate School is fifteen miles from R.A.'s assigned school and thirty-four miles from his home.  J.S. could transfer to South Girard School, another Phenix City public school serving eighth graders.  South Girard School is twelve miles from J.S.'s assigned school and home.  But J.S. believes that South Girard School's leaders have chosen not to accept transfer students under the AAA.

R.A. and J.S. represent that they could also transfer to Sanford Middle School or Smiths Station Junior High School, both operated by Lee County Board of Education, which are twenty-nine miles and twenty-one miles away, respectively.  But R.A. and J.S. represent that Lee County Schools have opted, system-wide, to refuse students seeking transfer under the AAA.  Consequently, R.A. and J.S. represent that their parents would have to travel in excess of 120 miles each day to reach a nonfailing public school that would admit them under the

AAA.[6]  Because their parents or guardians are on fixed incomes, neither student can afford the transportation expense of transferring to a nonfailing public school.

R.A. and J.S. claim that the least expensive private school within thirty miles of their failing school is Glenwood School, Inc., in Lee County, which charges $5,960 in tuition per year, exclusive of required fees and incidental costs. Glenwood is twenty miles from Russell County Middle School.  Glenwood is not participating in the AAA scholarship program, but even if it was, neither R.A. nor J.S. could afford tuition prior to receiving any tax credit.  Like the other Plaintiffs, R.A. and J.S. assert that they are "effectively trapped in their assigned failing school without meaningful access to a minimally adequate education."  (Doc. # 1, at 28, ¶ 104.)

### 3.    *J.R. and L.M.*

Plaintiffs J.R. and L.M. are assigned to attend the only public middle school serving their grade levels in Barbour County, Barbour County Junior High School. It also is a failing school as defined by the AAA.  J.R. does not read at his grade-level, and his grandmother does not believe that he will receive the assistance needed to read at grade-level while enrolled at Barbour County Junior High School.  L.M. similarly struggles with reading and writing, and his mother does not

---

[6] If South Girard School, Sanford Middle School, or Smiths Station Junior High School refused to admit J.S., it is not alleged what nonfailing public middle school is most accessible to him.

believe that Barbour County Junior High School has the resources or personnel to help him achieve his academic goals.

The closest nonfailing public school serving J.R.'s grade level is Banks School in Pike County, operated by the Pike County Board of Education. Banks School is twenty-three miles from J.R.'s failing school and nineteen miles from his home. The closest nonfailing public school serving L.M.'s grade level is Ariton School, a public school operated by the Dale County Board of Education. Ariton School is twenty-seven miles from L.M.'s assigned school and twenty-eight miles from his home. However, L.M. represents that the Dale County Board of Education has chosen to refuse students seeking transfer pursuant to the AAA. Thus, L.M. could potentially transfer to Pike County High School, which is twenty-nine miles from Barbour County Junior High School and thirty miles from his home.

J.R.'s guardian lacks the means to transport him seventy-six miles each day, five days a week, to Banks School or to pay any fees charged as a condition of his enrollment. Likewise, L.M.'s mother wants to transfer L.M. to Pike County High School, but she lacks reliable transportation and therefore cannot drive 120 miles each day or pay any fees associated with L.M.'s enrollment in Pike County. J.R. and L.M. represent that the closest private school is Parkview Christian Academy which charges $3,200 for tuition each year, exclusive of mandatory fees and

incidental expenses, but it is thirty miles from their assigned school in Barbour County.   Furthermore, Parkview is not participating in the AAA scholarship program.   Even if it became a participating school and transferring students could receive the tax credit, neither J.R. nor L.M. could afford to advance Parkview's costs.

On the whole, J.R. and L.M. feel trapped in their failing public school and are without the means to access an adequate education elsewhere.

### 4.     *K.R.*

K.R. is the only plaintiff not in a middle or junior high school.   He is five years old and is assigned to Linden Elementary School, the only public school serving kindergarteners in Linden City School System.   His school is a failing school as defined by the AAA.   K.R.'s guardian is concerned that K.R. will not receive basic instruction at Linden Elementary School.

There are three nonfailing public schools within thirty miles of Linden Elementary School.   U. S. Jones Elementary School and Westside Elementary School, both Demopolis City Schools, are sixteen and eighteen miles, respectively, from K.R.'s home and his failing school in Linden.   K.R. believes that officials within Demopolis City Schools have chosen not to accept students seeking transfer from outside its school system under the AAA.   The next closest nonfailing public elementary school is Uniontown Elementary School in Perry County.   Uniontown

Elementary School is twenty-seven miles from K.R.'s home and assigned school in Linden.

K.R.'s grandmother, who is his guardian, has a very limited income, and she does not own a car.  She cannot travel 108 miles each day to take K.R. to Uniontown Elementary, and she is unable to afford any fees charged as a condition of his enrollment.

The most affordable private school within thirty miles of K.R.'s failing school is Marengo Academy, which charges annual tuition of $4,260, excluding mandatory fees and incidental costs.  Marengo Academy is twenty-eight miles from Linden Elementary School.  It is not participating in the AAA scholarship program, so even if K.R.'s grandmother could pay his tuition to attend there, she would be ineligible for an AAA tax credit.  K.R., like the other Plaintiffs, is effectively trapped in his assigned failing school, unable to transfer to a nonfailing school as allowed by the AAA.

**D.** **Basis of the Alleged Equal Protection Violation**

On the basis of these facts, Plaintiffs argue that the AAA leaves them "and as many as four thousand of their peers" stuck in failing public schools, unable to overcome financial and geographical impediments to receiving a nonfailing education in a nonfailing public or nonpublic school.  (Doc. # 1, at 37, ¶ 148.) They assert that the denial of a minimally adequate education, particularly, the

opportunity to become literate, is a denial of the opportunity to enjoy self-expression, communicate with others, and to participate effectively in the American political process.  (Doc. # 1, at 37, ¶¶ 150–51.)  They posit that the AAA, in effect, "[d]istinguish[es] among Alabama school children with respect to their access to adequate educational opportunities on the basis of their parents' wealth and location," and this distinction is "not rationally related to advancing" any State interest in educating Alabama children.  (Doc. # 1, at 37–38, ¶ 152; *see also* Doc. # 1, at 2, ¶ 3 (asserting that the AAA "creates two classes of students assigned to failing schools – those who can escape them because of their parents' income or where they live and those . . . who cannot").)  In their brief, Plaintiffs refine their claim and argue that the AAA "creates *three* classes of children assigned to failing schools:  (1) those children eligible to transfer to nonfailing public schools within the same school system; (2) those children eligible to transfer to nonfailing public schools in another school system; and (3) those children eligible to transfer only to a nonpublic school (whether within the geographical confines of the local public school system or beyond it)."  (Doc. # 34, at 13 (emphasis added) (citations omitted).)

## E.   <u>Procedural History</u>

Plaintiffs filed this suit on August 19, 2013, pursuant to 42 U.S.C. § 1983, alleging a single count for the AAA's violation of the Equal Protection Clause and

seeking declaratory and injunctive relief against the implementation and enforcement of the AAA. Plaintiffs challenge only certain provisions in the AAA as unconstitutional (Doc. # 1, at 39) – particularly the school transfer benefit and tax credit[7] provisions within Sections 8 and 9 of the AAA, (Doc. # 34, at 11). Defendants' motion to dismiss (Doc. # 26) and brief in support (Doc. # 31) seek dismissal under both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). That is, Defendants argue that the court is without subject matter jurisdiction because Plaintiffs lack Article III standing and their case is not ripe. *See* Fed. R. Civ. P. 12(b)(1). And Defendants argue that even if the court has subject matter jurisdiction, Plaintiffs have failed to state an equal protection claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6).

## IV. DISCUSSION

### A.   <u>Subject Matter Jurisdiction</u>

#### 1.   *Constitutional Standing*

Article III of the U.S. Constitution limits federal courts to deciding cases and controversies. U.S. Const. art. III, § 2. "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006).

---

[7] By "tax credit provisions," Plaintiffs mean *both* the parent tax credit for private school tuition reimbursement and the individual and corporate taxpayer state income tax liability credits for donations to scholarship granting organizations. The AAA uses the term "tax credit" to refer to both. *See* Ala. Code §§ 16-6D-8(a) and 16-6D-9(a).

Because of the Constitution's case-or-controversy requirement, federal courts have developed a doctrine of standing to test whether cases are in fact justiciable.  To have standing, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Id.* at 342 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  The plaintiff's alleged injury must be both concrete and particularized and actual or imminent.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  There must be a causal connection between the injury and the defendant's conduct.  *Id.*  And it must be likely – not speculative – that the injury will be remedied by the court's decision in the plaintiff's favor.  *Id.* at 561.  Plaintiff, as "[t]he party invoking federal jurisdiction[,] bears the burden" of establishing standing.  *Id.*  "Failure to satisfy any of these three requirements is fatal" to the plaintiff's case.  *I.L. v. Alabama*, 739 F.3d 1273, 1278 (11th Cir. 2014).

The Supreme Court has conceded that the three concepts of standing are "not susceptible of precise definition."  *Allen*, 468 U.S. at 751.  While "clear [standing] rules developed in prior cases" often facilitate judicial determination of standing, a court must carefully examine the allegations in the complaint "to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."  *Id.* at 752.

### a.   Whether Plaintiffs Allege a Cognizable Injury

#### i.   Injury 1:  Inability to Transfer

Defendants do not devote any argument to the proposition that Plaintiffs' circumstantial inability to transfer under the AAA to nonfailing schools is an "injury in fact." (*See* Doc. # 31, at 22–23 (assuming, *arguendo*, that Plaintiffs allege a concrete injury and attacking the causation and redressability prongs of standing).)  The absence of any direct argument from Defendants does not relieve the court of its obligation to inquire whether Plaintiffs' inability to transfer is a cognizable injury.  *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975 (11th Cir. 2005) ("[Courts] are obliged to consider questions of standing regardless of whether the parties have raised them.").  This is especially true of the injury prong of standing.  *Am. Energy Solutions, Inc. v. Ala. Power Co.*, 16 F. Supp. 2d 1346, 1350 (M.D. Ala. 1998) (identifying injury as "[t]he most important" of the three elements).

The elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [the court] presume[s] that general allegations embrace those specific facts that are necessary

to support the claim." *Id.* (alteration omitted).   In this case, the complaint thoroughly details Plaintiffs' plight; Plaintiffs' inability to escape their failing schools is a predicament that is palpable and not conjectural.

But the "injury in fact" requirement demands that Plaintiffs allege that they are suffering "an invasion of a legally protected interest." *Bochese*, 405 F.3d at 980; *Lujan*, 504 U.S. at 560; *see also Bennett v. Spear*, 520 U.S. 154, 167 (1997) (supplanting "legally protected interest" phrase with "judicially cognizable interest"). A "legally protected interest" is one "protected by statute or otherwise." *Bochese*, 405 F.3d at 980 (citing *Cox Cable Commc'ns, Inc. v. United States*, 992 F.2d 1178, 1182 (11th Cir.1993)).   A "judicially cognizable interest" is, in the somewhat cynical words of a Tenth Circuit panel, "the sort of interest that courts think to be of sufficient moment to justify judicial intervention." *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) (citing Erwin Chemerinsky, Federal Jurisdiction § 2.3.2 at 74 (4th ed. 2003)).   The Eleventh Circuit holds to the clearer proposition that "[i]f the plaintiff is prosecuting a constitutional claim, . . . the injury must be the deprivation of a constitutional right." *Cone Corp. v. Fla. Dep't of Transp*., 921 F.2d 1190, 1204 (11th Cir. 1991).

Plaintiffs argue that the AAA "created a benefit" in the form of an opportunity to transfer to nonfailing schools from failing schools.  (Doc. # 34, at 19–20.)   But, they argue, the AAA "impermissibly distinguishes between

similarly situated children in the terms on which it offers access to nonfailing schools," thereby depriving Plaintiffs of the benefit of accessing nonfailing schools, in violation of the Equal Protection Clause.   (Doc. # 34, at 20.)[8]   The argument is that all students in public schools defined as failing are similarly situated.  Plaintiffs further contend that their inability to transfer is a deprivation of "a minimally adequate education."  (Doc. # 34, at 20.)  Plaintiffs finally assert that their complaint challenges "a discriminatory rule or policy impacting eligibility for a governmental benefit."  (Doc. # 34, at 21 (*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978); *Gratz v. Bollinger*, 539 U.S. 244, 260–62 (2003); *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Heckler v. Mathews*, 465 U.S. 728, 738–40 (1984)).  These arguments are consistent with the allegations on the face of Plaintiffs' complaint and establish at minimum the alleged deprivation of a constitutional right.  *See Cone Corp.*, 921 F.2d at 1204.

Plaintiffs' assertions in support of standing sound much like their arguments in opposition to Defendants' 12(b)(6) motion.   Courts must be careful not to confuse standing with the merits of a claim.  *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) (noting that "standing in no way depends on the merits of the plaintiff's

---

[8] As will be discussed *infra* on the merits, only a facial classification on the basis of students' geographical location is identifiable in the AAA.  There are no wealth-based facial classifications, but wealth is relevant to geographical location in the Black Belt and other rural parts of Alabama.

contention that particular conduct is illegal  . . .”); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (explaining that the “far-fetchedness” of a claim “is a question to be determined on the merits” and assuming, for standing purposes, the claim’s legal validity where the claim is a judicially cognizable one).   Consequently, the court accepts as “judicially cognizable” Plaintiffs’ allegation that the AAA violates Plaintiffs’ rights to equal protection.  Plaintiffs’ inability to transfer is an injury in fact.[9]

>           ii.      Injury 2: Diminished Funds to Public Schools

To bolster their Article III standing, Plaintiffs also allege as a second concrete injury that diminished funds are available to their failing schools as a result of the AAA’s enforcement.   Plaintiffs claim that the AAA siphons Alabama’s education funds for the payment of parent tax credits and diminishes tax revenues by reducing income tax collections from individual and corporate contributors who give funds to scholarship granting organizations.  “[A] plaintiff must demonstrate standing for each claim he seeks to press.”  *Davis v. Fed. Election Comm’n*, 554 U.S. 724, 734 (2008); *see also I.L.*, 739 F.3d at 1279 (“[S]tanding cannot be dispensed in gross . . . .”).  While Plaintiffs bring only one count of equal protection, they have asserted that the AAA unconstitutionally

---

[9] To be precise, the alleged denial of a minimally adequate education is important only to boost Plaintiffs’ claim from rational basis to heightened scrutiny review.  Plaintiffs have alleged an equal protection claim irrespective of claiming the denial of a quasi-fundamental right to an effective education.

harms them in more than one way.  Hence, the "injury in fact" inquiry must be repeated for the education funding injury.

Defendants contest extensively Plaintiffs' theory that they will be injured by a statewide decrease in public school funding.  (*See* Doc. # 1, at ¶¶ 3, 36 (alleging that all public schools, including Plaintiffs' failing schools, stand to lose funding because of the AAA's implementation).)  Defendants contend that this alleged injury is "too remote, speculative, and hypothetical to suffice" and "[P]laintiffs have failed to allege how any overall education spending reduction would work a discrete or concrete injury on themselves."  (Doc. # 31, at 24–25.)  Defendants also assert that Plaintiffs' complaint about reduced school funding is "a generalized grievance shared in common with all public school students" statewide.  (Doc. # 31, at 26 (citing *Allen*, 468 U.S. at 751).)[10]

Plaintiffs contend that the reduction in funding to their schools is real and capable of being measured.  That may be true, but Plaintiffs do not explain how the AAA's diversion of funds is invasive of their "legally protected interest" in equal

---

[10] "A claim is not a generalized grievance solely because the injury is shared in substantially equal measure by a large group of citizens.  Rather, a generalized grievance is one in which the plaintiff alleges . . . injury to his general interest as a taxpayer or citizen in having the government follow the law."  *Pub. Citizen, Inc. v. Miller*, 813 F. Supp. 821, 825–26 (N.D. Ga. 1993) (internal citations omitted).  Plaintiffs' complaint about diminished school funding does not appear to fall within either of the categories of cases that have been typified as generalized grievances because Plaintiffs allege that their own schools stand to lose funding. Nevertheless, what Defendants are trying to convey is understood, and Plaintiffs admit it themselves: All public school students in Alabama stand to suffer the same funding injury Plaintiffs allege.  (*See* Doc. # 34, at 9–10.)

protection of the law.  *See Bochese*, 405 F.3d at 980.  Diminished school funding may be a real consequence of Defendants' administration of the AAA, but Plaintiffs' alleged funding injury is unmoored from allegations of unequal or disparate treatment.  *See Cone Corp.*, 921 F.2d at 1204 ("[T]he [standing] injury must be the deprivation of a constitutional right."); *cf. I.L.*, 739 F.3d at 1273 (finding that "impediments to public education funding *arising from racially discriminatory state laws* can constitute . . . injury for purposes of standing" (emphasis added)).  In the absence of a connection between the AAA's diversion of state funds and the right to equal protection, Plaintiffs fail to carry their burden of showing a second, distinct "injury in fact" relating to public school funding.  The tax credit and school funding allegations of injury are due to be dismissed.

### b.  Whether Plaintiffs' Alleged Injury Is Fairly Traceable to Defendants' Enforcement of the AAA

The only surviving injury is Plaintiffs' inability to transfer.  Defendants argue that, assuming Plaintiffs have suffered an injury, "[P]laintiffs do not allege that the poor conditions in their schools are 'fairly traceable' to enforcement of the [AAA]."  (Doc. # 31, at 22.)  In other words, Defendants and the AAA cannot be blamed for Plaintiffs' preexisting circumstances.  Though the AAA defines what a failing school is, Plaintiffs agree that the AAA did not cause the failure of their schools.

Plaintiffs respond that to establish causation for standing purposes, they need only show indirect causation – not proximate cause. (*See* Doc. # 34, at 22 (citing *Resnick*, 693 F.3d at 1324).) Plaintiffs assert that the only transfer options available to children in failing schools are transfers pursuant to the AAA.[11] But the AAA's terms of transfer are expensive and unworkable for low-income students in isolated areas of Alabama like the Black Belt where there are few school options. Thus, Plaintiffs assert that their injury – specifically, their inability to transfer schools to obtain an education in a nonfailing school, while other similarly situated children are able to transfer schools – is "fairly traceable" to the implementation of the AAA.

Defendants' arguments on causation evade Plaintiffs' alleged constitutional harm. The complained-of injury, according to Plaintiffs, is the denial of equal protection, insofar as the AAA creates a right to transfer to a nonfailing school, but makes transfer available to some students on different terms. Other students in

---

[11] Plaintiffs also contend that Superintendent Bice and Governor Bentley are jointly responsible for eliminating Plaintiffs' ability to transfer schools under the federal No Child Left Behind Act of 2001, because Bice, and indirectly, Bentley, opted out of compliance with No Child Left Behind's provisions. (*See* Doc. # 34, at 23–24.) These facts are not alleged in the complaint. Defendants reply that it is not clear that No Child Left Behind provided Plaintiffs with any school choice options that they lack under the AAA, but even if that is the case, it does not matter because opting out of No Child Left Behind is not what Plaintiffs have alleged is wrongful. Defendants assert that Plaintiffs' injury must be traced to Defendants' "allegedly unlawful conduct" – which, in this case, is the enforcement of the AAA. (Doc. # 35, at 10.) The court agrees and will consider only the allegations in the complaint concerning the AAA's impact on Plaintiffs.

different geographical circumstances[12] would lack state-assisted access to a more adequate education in nonfailing schools, just as Plaintiffs do, if Defendants had not implemented the AAA.  But Defendants have implemented the AAA, Plaintiffs are unable to benefit from it, and thus, Defendants' actions are fairly traceable to Plaintiffs' alleged equal protection injury.   Having established a plausible constitutional injury in fact, Plaintiffs also meet their burden of satisfying the causation prong of the standing doctrine.

### c.   Whether Plaintiffs' Injuries Are Redressable

Defendants further contend that Plaintiffs' "'we're trapped' theory of injury fails the redressability requirement" of standing.  (Doc. # 31, at 22.)  Defendants propose that granting Plaintiffs the relief they seek – *i.e.*, an injunction prohibiting implementation and enforcement of the AAA – "will not improve [Plaintiffs'] schools or give them an 'opportunity to obtain a nonfailing education.'"  (Doc. # 31, at 23.)

But Plaintiffs counter that an injunction against the AAA's enforcement will remedy their alleged equal protection injury.  Plaintiffs posit that they will not be subject to the denial of equal protection once other students are no longer allowed to enjoy the benefits that Plaintiffs are being denied.  (*See* Doc. # 34, at 27–28 (citing *Heckler*, 465 U.S. at 740 (reasoning that "when the right invoked is that of

---

[12] Discussion of the income-based aspect of the alleged discrimination is deferred here due to the failure of that aspect on the merits.  *See infra* Section IV.B.2.a.

equal treatment, the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." (internal quotation marks, original emphasis, and citation omitted))).)[13]

Plaintiffs' requested relief (*i.e.*, the withdrawal of the option of any student to transfer from a failing school) results in everyone who is assigned to a failing school continuing to suffer together in failing schools.   Defendants find this objectionable.   (*See* Doc. # 31, at 22 ("[P]laintiffs appear to seek an injunction prohibiting anyone from transferring anywhere.").)   But the requested injunction is an acknowledged (though mean-spirited) remedy, if in fact the AAA's enforcement violates Plaintiffs' equal protection rights.   *See Heckler*, 465 U.S. at 740;[14] *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 427 (2010) (citing *Heckler* and reasoning that when the appropriate remedy is an order requiring equal treatment, that result "can be accomplished in more than one way" (internal quotation marks omitted)). Thus, accepting as true Plaintiffs' merits theory that the AAA effectively denies them the AAA's benefits of obtaining an education in a nonfailing school, it is

---

[13] In reply, Defendants focus on *Heckler*'s proposition that an appropriate remedy could include an "extension of benefits" to Plaintiffs.  But Plaintiffs request the first remedy announced in *Heckler* – the withdrawal of benefits from the allegedly favored class.

[14] *Heckler* involved a protected classification – gender – and an indisputable denial of benefits on the basis of gender on the face of a federal law.  The circumstances are not nearly so stark here.  At oral argument, Plaintiffs acknowledged the court's remedial power to order affirmative remedies if a constitutional violation is established.

likely that the court could redress Plaintiffs' alleged injury by ordering the requested injunctive relief.

### 2. *Ripeness*

Another implied limitation within the Constitution's case-or-controversy requirement is the doctrine of ripeness.  The doctrine prevents courts from prematurely adjudicating disputes before the effects of a challenged action have been felt by the plaintiff in a concrete way.  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003).  Evaluating whether a plaintiff's claim is ripe requires inquiry into (1) whether the issues are fit for judicial decision and (2) whether withholding consideration would impose hardship upon the parties.  *Id.* at 808.

Defendants assert that Plaintiffs' case against the enforcement of the AAA is not yet ripe because the AAA's provisions are novel, and thus, Defendants suggest it would be prudent to wait to see what consequences the AAA will have, when, for instance, more private schools choose to participate, or when school leaders in failing schools mobilize themselves to compete, improve, and thereby avoid the consequences of being designated as "failing."  "Whatever happens," Defendants contend, Plaintiffs' "own allegations establish that they will not be appreciably worse off by a delayed decision" on the AAA's constitutionality as applied to

them.  (Doc. # 31, at 23.)   Plaintiffs respond that their injuries are directly and immediately felt.[15]

Defendants fail to persuade that this is the sort of case that is unfit for judicial consideration.  It is apparent that this is not a request for pre-enforcement review of the constitutionality of the AAA.  The law is in effect, and Plaintiffs say they are unable to enjoy the benefits of transfer to nonfailing schools, which is the primary basis their alleged equal protection claim.  Plaintiffs' case is ripe.

### 3.   *Governor Bentley's Entitlement to Immunity*

As an additional jurisdictional argument, Governor Bentley claims that he is entitled to dismissal from suit based on grounds of sovereign and Eleventh

---

[15] At this point in their argument, Plaintiffs identify their injuries as being threefold, rather than twofold.  They identify as injuries (1) their effectively unequal treatment under the AAA, (2) the potential diversion of funds from their assigned schools per the AAA, and (3) the "stigmatization" of being relegated to "failing" schools.  The complaint makes no mention of stigmatization as an injury.  Rather, this theory of injury is articulated only in Plaintiffs' responsive briefing.  (*See* Doc. # 34, at 28 ("Discrimination . . . by stigmatizing members of the disfavored group as 'innately inferior' . . . can cause serious non-economic injuries . . . ." (quoting *Heckler*, 465 U.S. at 739–40)); Doc. # 34, at 30 ([Plaintiffs' constitutional injury] is further compounded by the intangible harms inflicted upon Plaintiffs' schools – and Plaintiffs as students enrolled therein – in the form of stigmatization.").)

Defendants reject Plaintiffs' "stigmatization" argument and reply that the Supreme Court has held that "[s]tigmatic injury . . . accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct."  (Doc. # 35, at 10 (citing *Allen*, 468 U.S. at 755).)  It is true, as *Allen* and other cases make clear, that a plaintiff claiming to have suffered a stigmatic injury must show that he or she has been "personally subject[ed] to" alleged discrimination.  *Allen*, 468 U.S. at 755.  The court declines to consider Plaintiffs' alleged stigmatic injury for a more basic reason.  Plaintiffs have alleged no facts in their pleading suggesting that Defendants' enforcement of the AAA stigmatizes them.

The court has previously disposed of the diversion of tax funds argument as not stating a cognizable constitutional injury.

Amendment immunity. To join Governor Bentley to this suit, Plaintiffs must show that he is "responsible for the challenged action" of enforcing or implementing the AAA. *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988). Governor Bentley must, "by virtue of his office, have some connection with" the enforcement of the allegedly unconstitutional AAA. *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)) (quotation marks and alterations omitted). "Whether this connection arises out of general law, or is specially created by the act itself, is not material so long as it exists.'" *Id.* at 1015–16 (quoting *Young*, 209 U.S. at 157) (alterations omitted). But Governor Bentley's connection to the AAA cannot be "too attenuated to establish that he is responsible for" its implementation. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003).

In *Women's Emergency Network*, the Eleventh Circuit rejected the plaintiffs' argument that the Governor of Florida was a proper defendant because he was ultimately responsible for the Department of Highway Safety and Motor Vehicles, the state agency charged by the challenged statute with issuing specialty license plates. *Id.* at 949. The court explained that "[w]here the enforcement of a statute is the responsibility of parties other than the governor[,] . . . the governor's general executive power is insufficient to confer jurisdiction." *Id.* at 949–50.

Plaintiffs argue that various Alabama statutes vest Governor Bentley with the task of preparing the State's general and education budgets each year, and thus,

he "is obligated to participate in the implementation of the AAA, generally, and in the determination of how the diversion of funds from the ETF as a result of tax credits paid pursuant to the AAA will be absorbed in Plaintiffs' school systems, specifically." (Doc. # 34, at 48.)  The AAA's enforcement requires no affirmative action of the Governor, but it demands action from the other named defendants. *See generally* Ala. Code §§ 16-6D-1–16-6D-10; *see also Women's Emergency Network*, 323 F.3d at 949–50.  And the Governor's statutory authority over the preparation of Alabama's budgets is too attenuated a connection to make him a proper defendant.  To conclude otherwise would authorize a plaintiff to challenge any state statute involving the appropriation of state funds merely by naming the governor as a defendant.  *See Women's Emergency Network*, 323 F.3d at 949 (citing *Harris v. Bush*, 106 F. Supp. 2d 1272, 1277 (N.D. Fla. 2000)).  For these reasons, Governor Bentley is entitled to immunity from suit, and he is due to be dismissed as a defendant.[16]

### 4.   *Jurisdictional Conclusions*

Plaintiffs' allegations are sufficient to establish Article III standing, and the case is ripe for review.  Therefore, the court assumes jurisdiction and proceeds to the merits of Defendants' motion to dismiss.  However, Governor Bentley is not a proper defendant to this action and is due to be dismissed.

---

[16] Even if the Governor were a proper party, Plaintiffs' claim fails on the merits, as will be seen.

## B.   <u>Equal Protection Claim</u>

Defendants attack Plaintiffs' complaint as failing to state a valid equal protection claim.  They assert that the AAA does not discriminate based on any student's family income or geographical location, but even if the AAA discriminates on those bases, the law is justified by its rational relationship to Alabama's legitimate interest in "provid[ing] educational flexibility and state accountability for students in failing schools."   Ala. Code § 16-6D-8(a). Defendants argue that Plaintiffs' complaint is due to be dismissed.

### 1.   *The Parties' Arguments*

Defendants open their 12(b)(6) argument by contending that the AAA makes no attempt to classify students on the basis of their family income or their geographical location.  Defendants contend that the AAA's provisions therefore qualify as rules of general applicability that satisfy the constitutional requirement of equal protection without any further inquiry.  (Doc. # 31, at 28 (citing *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 588 (1979)).)  Defendants assert that Plaintiffs "complain of unequal results based not on any government mandate but on their 'financial and geographical' circumstances."   (Doc. # 31, at 29.)

Defendants conclude that "[t]his is *de facto* discrimination" that "is not subject to [judicial] scrutiny."  (Doc. # 31, at 29 (citation omitted).)[17]

Defendants argue that even if the AAA discriminates against Plaintiffs as alleged, Alabama's governmental interest in providing a nonfailing education to children justifies any discrimination.  Defendants assert that because Plaintiffs' income-levels and geographical locations are not suspect classifications, and because the AAA's enforcement does not interfere with the exercise of Plaintiffs' fundamental rights, rational basis review is proper.  When rational basis scrutiny is applied, Defendants assert that the AAA's provisions are "unquestionably constitutional."  (Doc. # 31, at 37.)

Plaintiffs dispute Defendants' assertion that this case calls for rational basis review.  Plaintiffs believe that the AAA "implicates the complete denial of educational rights to a particular class of children," which requires the court to

---

[17] Defendants also discuss *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 n.5 (11th Cir. 1987), in which the Eleventh Circuit acknowledged that "[e]qual protection claims can be divided into three broad categories."  A plaintiff can show that a challenged law violates the Equal Protection Clause because it discriminates (1) on its face; (2) through disparate impact; or (3) through defendants' unequal administration.  *Id.*  Defendants suggest that Plaintiffs' complaint "comes closest to stating a disparate-impact theory," but no other theory.  (Doc. # 31, at 28.)  Defendants assert that to support a disparate impact-type equal protection claim, Plaintiffs must allege – and later, prove – purposeful discrimination.  Defendants say that Plaintiffs must allege that the Alabama Legislature passed the AAA "because of . . . [the AAA's] adverse effects upon poor and rural Alabama school children," (Doc. # 31, at 28 (internal quotation marks and citation omitted)), but that Plaintiffs' allegations fall short of this mark.

Plaintiffs do not directly address Defendants' analysis in their responsive briefing, which leads Defendants to deduce in their reply brief that Plaintiffs are pursuing a claim of facial discrimination.  At oral argument, Plaintiffs affirmed that their claim is a facial challenge.

apply a heightened level of scrutiny; thus, they propose that the court must ask whether the AAA "furthers some substantial [state] goal." (Doc. # 34, at 45 (citing *Plyler v. Doe*, 457 U.S. 202, 224 (1982)).) Plaintiffs assert, as they allege in their complaint, that their denial of transfer under the AAA deprives them of the opportunity to receive a "minimally adequate education." (Doc. # 34, at 35; Doc. # 1, at 37, ¶ 150.) Plaintiffs acknowledge that the Supreme Court has not held that public education is a fundamental right, but they represent that the Supreme Court left open the possibility that courts might apply greater judicial scrutiny if a state "failed to provide each student with the opportunity to gain 'basic minimal skills.'" (Doc. # 34, at 36 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973)).) Plaintiffs liken their case to *Plyler* and argue that their challenge to the AAA calls for a higher level of scrutiny.

Alternatively, Plaintiffs claim that "[t]he AAA's impermissible distinction between Plaintiffs and other children assigned to failing schools constitutes discrimination of an unusual character," and thus, this discrimination "especially require[s] careful consideration." (Doc. # 34, at 41 (citing *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013); *Romer v. Evans*, 517 U.S. 620, 632–34 (1996)).)

And finally, Plaintiffs respond that even without some form of heightened scrutiny, their equal protection challenge survives rational basis scrutiny because

"[e]xcluding Plaintiffs from the [AAA's] transfer benefit . . . does not promote" Alabama's "express goals" of advancing educational flexibility and state accountability for students in failing schools. (Doc. # 34, at 45.) Rather, Plaintiffs contend that the implementation of the AAA and the effective denial of the AAA's transfer benefits to Plaintiffs are "wholly counterproductive to [the State's] goals." (Doc. # 34, at 45.)

In reply, Defendants criticize Plaintiffs for not responding to Defendants' most basic argument that the AAA does not classify anyone on any basis. Defendants assert that Plaintiffs' complaint is replete with legal conclusions, and after these conclusions are eliminated from the pleading, it becomes apparent that Plaintiffs fail to state a claim for relief.

For example, with regard to Plaintiffs' allegations that the AAA denies Plaintiffs the opportunity to enjoy the AAA's benefits and treats Plaintiffs differently than similarly situated students, Defendants contend that the AAA unconditionally makes transfer an option for, and tax credits available to, any family in a failing public school. Defendants posit that "even where the AAA limits these benefits – such as the requirement that parents provide transportation in some circumstances – the limit[ation] does not on its face turn on [a student's] wealth or geograph[ical location]." (*See* Doc. # 35, at 6 (internal citation omitted).) As for Plaintiffs' allegations that the AAA traps them in failing schools

and deprives them of a minimally adequate education, Defendants contend that the AAA "does not speak to the educational experience of students who remain in their assigned schools." (Doc. #35 at 6.) Defendants protest that Plaintiffs' characterization of the poor quality of their schools as a denial of "minimally adequate education" is conclusory because there is no constitutional standard for what minimal quality of education states are required to provide. Thus, Defendants encourage the court to ignore any legal conclusions cloaked as factual allegations.

As for Plaintiffs' arguments for heightened scrutiny, Defendants assert that *Plyler*'s standard was suitable only for the unique facts of that case, and that *Windsor* and *Romer* are readily distinguishable. Applying rational basis scrutiny, Defendants argue that Plaintiffs' case must fail because Plaintiffs cannot "negative every conceivable [rational] basis that might support the [AAA]." (Doc. #35, at 15 (citing *Heller v. Doe*, 509 U.S. 312, 320 (1993)).)

### 2. *Analysis*

#### a. **Threshold Inquiry: Whether the AAA Classifies Anyone**

Plaintiffs have alleged that the AAA "treat[s] differently" Alabama schoolchildren assigned to failing schools "who are in all relevant respects alike." *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). This is the essence of

an equal protection claim. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (describing the Equal Protection Clause as a directive "that all persons similarly situated should be treated alike"). Defendants are correct that if the AAA does not classify or otherwise make distinctions among students assigned to failing schools, there is nothing to scrutinize under any standard. *See Beazer*, 440 U.S. at 588 (noting that a government rule of general applicability to all persons "satisfies the equal protection principle without further inquiry"); *Christy v. Hodel*, 857 F.2d 1324, 1331–32 (9th Cir. 1988) (requiring that plaintiff show that a law "classifies persons in some manner" before the law can be subjected to "any form of review").

Upon review of the allegations in the complaint and of Sections 8 and 9 of the AAA, it is apparent that the AAA treats some students assigned to failing schools differently than it treats others. For example, with regard to the burden of transportation, Section 16-6D-8(b)(8) provides that

> [i]f a parent enrolls a student in a nonfailing public school *within the same local school system*, and that system provides transportation services for other enrolled students, transportation costs to the nonfailing public school shall be the responsibility of the local school system. Local school systems may negotiate transportation options with a parent to minimize system costs. If a parent enrolls a student in a nonpublic school or in a nonfailing public school *within another local school system*, regardless of whether that system provides transportation services for other enrolled students, transportation of the student shall be the responsibility of the parent.

(emphasis added).  The burden of transportation to a nonfailing public school does not exist for families who live in more populous areas of Alabama with larger "local school systems" from which those families may select a nonfailing public school.  But the AAA does burden with transportation families who must enroll their child "in a nonfailing public school within another local school system."  *Id.*[18]

Another example is the AAA's treatment of students assigned to failing schools who, by necessity, must look outside their local school system for a nonfailing public school, *vis-à-vis* students assigned to failing schools who have alternative nonfailing public school offerings within their local school system.  The first category of students may be denied admission by sister school systems.  Ala. Code § 16-6D-8(b)(5) and (d)(1)–(2).  But the latter category of students has statutorily protected public school choice options within his or her local school system.  *Id.* at § 16-6D-8(b)(4).

It does not matter that there may be reasons for these distinctions.  What matters at this point is that there are facially discriminatory provisions of the AAA that are susceptible to scrutiny.  All students assigned to schools designated as failing by the AAA are similarly situated to one another.  But some students are treated differently with respect to transportation costs if their own local school system has no nonfailing options, and potentially, upon a sister school system's

---

[18] However, all families are equally burdened with transportation costs if they choose private school. *See id.*

refusal to admit them when their local school is failing.  These are, as Plaintiffs claim, geographically based classifications, not in the sense that the AAA expressly discriminates against a particular rural area like the Black Belt or favors metropolitan areas, but in the sense that the AAA treats students differently on the basis of whether they live within a district with nonfailing public school options or a district with no nonfailing public school options.

There is no doubt that living in a rural part of Alabama necessarily requires additional family income for transportation to a school outside of a student's local community.  Yet no wealth-based classification is apparent on the face of the challenged portions of the AAA.  *See* Ala. Code §§ 16-6D-8 and 16-6D-9. Plaintiffs allege that they cannot afford to transfer on the AAA's terms and argue that the AAA "predictably burden[s]" them and others in their circumstances. (Doc. # 34, at 46.)  But Plaintiffs offer no authority – and the court is aware of none – that a law is facially discriminatory simply because it, in effect, burdens various classes of people (*e.g*., the rich and the poor) differently.  That argument implicates a disparate impact theory, which Plaintiffs have expressly disavowed.

Furthermore, even if a disparate impact theory were at stake, it would be difficult to identify the families assigned to failing schools that are wholly incapable of bearing the expense of transportation to another school or the advancement of private school tuition prior to receipt of an income tax credit.  A

distinction based upon "those who can and those who cannot" escape failing schools because of their income, (*see* Doc. # 1, at ¶¶ 3, 148), is incapable of meaningful, objective analysis.  The variables are legion – *e.g.*, rural versus urban, rural versus small town, availability of school alternatives, variable distances to schools, relative wealth of the community and individuals, community population, location of nonpublic schools, cooperativeness of nonfailing public and nonpublic schools, size and circumstances of family, the location or roads and bridges, and a host of other factors.

Ultimately, with respect to the facial challenge to the AAA, Plaintiffs are unable to adequately identify an income-based class or classification subject to disparate treatment.  Hence the discussion proceeds to scrutinize only the geographically-based classifications in the AAA – *i.e.*, those classifications based on a student's location in a local school system.

### b.    Appropriate Level of Scrutiny

Having determined that Plaintiffs plausibly allege that AAA classifies them in some way, the next question is what level of scrutiny should apply.  It is undisputed that geographical location is not a suspect classification.  But Plaintiffs theorize their inability to transfer constitutes a denial of a minimally adequate, nonfailing education, and they claim that such an education is a "quasi-fundamental right" pursuant to *Plyler*.  (Doc. # 34, at 38.)  And because something

almost as sacred as a fundamental right is at stake, Plaintiffs argue that their equal protection claim invites a higher level of judicial scrutiny than rational basis review. The question presented is whether Plaintiffs have pleaded facts that could support an equal protection claim subject to a higher level of scrutiny than rational basis review.

### i.    An Equal Protection Claim Analogous to *Plyler*

*Plyler* addressed a Texas law that authorized local school districts to deny enrollment in their public schools to children not lawfully present in the United States. 457 U.S. at 205. The Supreme Court acknowledged that the Texas legislature normally should be entitled to "substantial latitude to establish classifications" in social legislation. *Id.* at 216. Nevertheless, the Court refused to apply rational-basis scrutiny to the statute. While acknowledging *Rodriguez*'s holding that education is not a fundamental right protected by the Constitution, *id.* at 221 (citing *Rodriguez*, 411 U.S. at 35), the Court reasoned that neither is education "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation," *id*. After discussing the obvious virtues of education, both for individuals and for society at large, the Court reasoned that where a state undertakes to provide an education, it "is a right which must be made available to all on equal terms." *Id.* at 223 (quoting *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954)). The Court then applied heightened or intermediate scrutiny, requiring that

Texas demonstrate that the statute in question furthered a substantial state goal.  *Id.* at 224.  Texas failed to offer a substantial state interest justifying its absolute denial of public education to the plaintiffs, and the Supreme Court held that the statute violated the Equal Protection Clause.  *Id.* at 230.

Plaintiffs insist that their case is analogous to *Plyler*, but *Plyler* is dissimilar in significant ways.  Texas sought to completely withhold the benefit of public schooling from "a discrete class of children not accountable for the disabling status."  457 U.S. at 223.  Plaintiffs argue that they are not to blame for their poverty or their geographic isolation.  Further, they assert that they belong to an identifiable class of "children assigned to failing schools in failing islands" of the State where there are "no grade-appropriate nonfailing schools."  (Doc. # 34, at 13.)  It is possible to identify a discrete class of Alabama students who are stuck in failing public school systems.  It is also possible to identify those families who will be responsible for transportation costs.  However, as explained previously, it is not possible to identify and classify a discrete group of children whose families "cannot afford" to escape their failing schools on the AAA's terms, and that is how Plaintiffs have described themselves in the complaint.  (*See* Doc. # 1, at 2, 17, 24, 30, 35.)  Even accepting Plaintiffs' alternative three-tiered classification based on "eligibility" to transfer, *see supra*, at 19, Plaintiffs still fail to show a denial of

public education to a discrete class because all students assigned to failing schools are "eligible" to transfer.

Plaintiffs also liken their situation to *Plyler* by averring that they are enduring a "complete denial of education" in their failing schools.  (Doc. # 34, at 10, 35.)  The quality of education in their failing schools is substandard by the very terms of the AAA itself.  (Doc. # 34, at 36 ("Defendant Bice acknowledged that Plaintiffs are being denied an education when he designated their schools as 'failing' based on the criteria specified in the AAA."); *see also* Doc. # 34, at 15–16 (citing the complaint's allegations that Plaintiffs' teachers are not teaching them and that Plaintiffs are not given personal access to resources such as books and laboratory equipment).)  On these grounds, Plaintiffs declare that they are no better off than the children in *Plyler*.  (*See* Doc. # 34, at 35 ("Plaintiffs are, indeed, being denied an education.  Plaintiffs' schools do not offer students minimally adequate instruction . . . .").)  But this line of argument highlights precisely the Plaintiffs' conundrum in defining a discrete class.  The complained-of injury afflicts *all* students in failing schools, not just those who "cannot escape" failing schools.  The argument is self-defeating; it undermines Plaintiffs' own definition of Plaintiffs' discrete classification.

Upon consideration of Plaintiffs' allegations and arguments, the court must conclude that their case is not similar to *Plyler* because Plaintiffs have not alleged

facts supporting any inference that they are altogether without a state-provided education because of the AAA, and because Plaintiffs' suggestion of a discrete class fails by definition.  What is more, *Plyler* was an exceptional case of denial of all educational benefits to a very specific class.  *See Kadrmas v. Dickinson Pub. Schools*, 487 U.S. 450, 459 (1988) ("We have not extended [*Plyler*'s] holding beyond the unique circumstances that provoked its unique confluence of theories and rationales." (internal quotation marks and citations omitted)).  The facts here, while lamentable, are not so extreme as to extend the heightened scrutiny applied in *Plyler*.

Plaintiffs further contend that the Supreme Court in *Rodriguez* "recognized, and left open, the possibility that a state educational system that failed to provide each student with the opportunity to gain '*basic minimal skills*' would trigger greater judicial scrutiny."  (Doc. # 34, at 36 (quoting *Rodriguez*, 411 U.S. at 38) (emphasis added).)  It is true that in *Papasan v. Allain*, 478 U.S. 265, 284 (1986), the Supreme Court remarked that *Rodriguez* "did not . . . foreclose the possibility that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either the right to speak or the right to vote." (internal quotation marks and alterations omitted).  On the basis of this open question, Plaintiffs speculate that the "identifiable quantum of education," protected by the Constitution is at least the caliber of instruction available at

transfer schools made accessible to some Alabama students by the AAA. (*See* Doc. # 1, at 37, ¶ 150 ("The AAA abandons Plaintiffs in failing schools that deny them access to a minimally adequate education, which, in turn, deprives Plaintiffs of meaningful opportunities for self-expression, communication with others, and ultimately the tools for effective participation in the American political process.").)

The court is not persuaded that Plaintiffs have a fundamental right to an education superior to the one they are afforded right now in their assigned schools. Even if they did, Plaintiffs' class is mismatched with their equal protection claim. The unfavorably treated class would be all students assigned to what the AAA defines as a failing school, which, in effect, would destroy the purported discrete class. Moreover, four decades after *Rodriguez*, neither the Supreme Court nor the Eleventh Circuit has defined what "identifiable quantum of education" is constitutionally required. That inquiry suggests a different case altogether, one in which education standards *per se* are at issue.

This court will not presume to set that definition by allowing Plaintiffs' claim to proceed under the theory that they are receiving less than the "basic minimal skills" to which they are constitutionally entitled. For these reasons,

Plaintiffs' equal protection challenge to the AAA is not entitled to a heightened level of scrutiny afforded by *Plyler* or alluded to by *Rodriguez*.[19]

### ii.   An Equal Protection Claim Akin to *Windsor* or *Romer*

*Windsor*, which recently invalidated Section 3 of the federal Defense of Marriage Act, and *Romer*, which struck down a Colorado constitutional amendment prohibiting state governmental protection of homosexual persons, both held that "discriminations of an unusual character" require closer judicial scrutiny than ordinary rational basis scrutiny. *Windsor*, 133 S. Ct. at 2693; *Romer*, 517 U.S. at 633. In *Windsor*, the Court reasoned that Congress had deviated "from the usual tradition of recognizing and accepting state definitions of marriage." 133 S. Ct. at 2693.[20] And in *Romer*, the Court noted that Colorado's Amendment 2 "seem[ed] inexplicable by anything but animus," 517 U.S. at 632, and was "unprecedented" in kind, *id.* at 633. The Court also held that Amendment 2 did not bear a rational relationship to a legitimate governmental purpose. *Id*. at 635.

---

[19] Plaintiffs also point to precedent from this district to support its argument that the State may not "exclude[] some children from receiving a public education while allowing access [to public education] to others." (Doc. # 34, at 40 (citing *Lee v. Macon Cnty. Bd. of Ed*., 231 F. Supp. 743, 754 (M.D. Ala. 1964)).) Without undertaking to explain the universe of differences between this case and *Lee*, decided forty-seven years ago, *Lee* is inapposite.

[20] It is not clear what level of scrutiny the Supreme Court applied in *Windsor*. *See id.* at 2706 (Scalia, J., dissenting) ("[I]f this is meant to be an equal-protection opinion, it is a confusing one. The opinion does not resolve and indeed does not even mention what had been the central question in this litigation: whether, under the Equal Protection Clause, laws restricting marriage to a man and a woman are reviewed for more than mere rationality.").

Plaintiffs contend that, like DOMA and Colorado's Amendment 2, the AAA is unusually discriminatory in that it expresses the Alabama Legislature's "antipathy toward failing public schools and the children abandoned by the AAA" within the failing schools. (Doc. # 34, at 41.) This antipathy is evidenced, Plaintiffs claim, by the AAA's utility to wealthier families who can afford to take advantage of the AAA's transfer and tax credit options as well as the AAA's allowance for scholarship granting organizations to award taxpayer-donated scholarship funds to any student, not just students attempting to escape failing schools, after September 15th each year. The AAA is "unusual," they say, in two aspects: (1) the AAA's "perverse operation" of "denying benefits to those children most in need" of benefits; and (2) the AAA's failure to provide for economically disadvantaged students (as other states' school-choice laws do). (Doc. # 34, at 42.)[21] But these arguments lead the court astray.

Plaintiffs' complaint is devoid of allegations supporting the inference that the Alabama Legislature discriminated in an unusual manner against Plaintiffs. Plaintiffs do allege that the AAA's passage was the product of partisan politics in the Alabama Legislature, but that can be said of most legislation, regardless of the state and the party with a majority. Plaintiffs point to no aspect of the AAA that suggests the Legislature harbored animus toward some children (*i.e.*, the poorer) in

---

[21] Of course, Alabama had no obligation to follow other states' school choice laws as templates when crafting the AAA.

failing schools, but not others (*i.e.*, the wealthier).  Most significantly, unlike the AAA, the laws at issue in *Romer* and *Windsor* involved explicit provisions directed toward very specific classes of people, thereby singling out clearly identifiable groups (homosexual persons) for differential treatment.  Here, the AAA affects a broad class of students of all income levels who live within geographically demarcated local school systems.  Nothing about this classification suggests animus or a peculiar effort to discriminate.  For these reasons, Plaintiffs' claim does not warrant the more "careful consideration" or scrutiny that the Court applied in *Windsor* or *Romer*.

### iii.    Rational Basis Review

Having concluded that Plaintiffs' equal protection claim is not entitled to a heightened level of scrutiny, the court finds that the claim is subject to rational basis review.  In the absence of plausible allegations that a state law burdens a fundamental right, "the Equal Protection Clause requires only that [a state] classification be rationally related to a legitimate state interest."  *Lofton*, 358 F.3d at 804.  The court may dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action."  *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).  Whether a statute

survives rational basis scrutiny is a question of law.  *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1578 (11th Cir. 1989).[22]

Applying the rational basis test involves two steps: (1) identifying a legitimate governmental purpose that the Alabama Legislature hypothetically could have been pursuing when it passed the AAA; and (2) determining whether a conceivably rational basis exists for the Legislature to believe that the AAA would further that purpose.  *See Joel v. City of Orlando*, 232 F.3d 1353, 1358 (11th Cir. 2000).  At step one, Defendants point to the Legislature's express reason for the school-choice provisions of the AAA: "[t]o provide educational flexibility and state accountability for students in failing schools."  Ala. Code § 16-6D-8(a).  And at step two, Defendants say that it is conceivable that the AAA's provisions allowing students to transfer out of failing schools could serve the Legislature's

---

[22] As the Seventh Circuit explained in *Wroblewski v. City of Washburn*, "[a] perplexing situation is presented when the rational basis standard meets the standard applied to a dismissal under Fed. R. Civ. P. 12(b)(6)."  965 F.2d 452, 459 (7th Cir. 1992).  "The rational basis standard . . . cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard.  The latter standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail on an equal protection claim."  *Id.* at 459–60.

"While [a court] therefore must take as true all of the complaint's allegations and reasonable inferences that follow, [it must] apply the resulting 'facts' in light of the deferential rational basis standard.  To survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications."  *Id.* at 460.  The court approaches Defendants' motion to dismiss with these principles in mind.

express purposes for the AAA.  Defendants' analysis is sound.[23]  Moreover, the Legislature's policy solution to a perceived problem does not have to be perfect, or the one that a court would choose.  *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993) ("[J]udicial intervention is generally unwarranted no matter how unwisely [a court] may think a political branch has acted.").

Plaintiffs respond that "the AAA necessarily furthers [its stated] purpose, if at all, only for those students *able* to transfer from designated failing schools . . . and does so at the expense of other children's education."  (Doc. # 34, at 44.)  They further argue that "[e]xcluding [them] from the transfer benefit offered by the AAA does not promote educational flexibility or state accountability for them."  (Doc. # 34, at 45.)  Thus, Plaintiffs are critical not only of the AAA's scheme of providing educational alternatives to students in failing schools, but especially of the AAA's failure to provide meaningful alternatives to *them*.  Plaintiffs' attack centers on the AAA's provision requiring that transferring families provide their own transportation to nonpublic schools and public schools in other school systems.  *See* Ala. Code § 16-6D-8(b)(8) ("If a parent enrolls a student in a nonpublic school or in a nonfailing public school within another local school system, regardless of whether that system provides transportation services for other enrolled students, transportation of the student shall be the responsibility of the

---

[23] Other conceivable and more specific rationales include incentivizing failing schools to improve and motivating marginal schools to avoid a "failing" designation.

parent."). Plaintiffs also criticize the AAA's proviso that "[n]othing in [the AAA] shall be construed to force any public school, school system, or school district or any nonpublic school, school system, or school district to enroll any student" seeking transfer from a failing school. *See id*. at § 16-6D-8(d)(1); *see also id*. at § 16-6D-8(b)(5) and (d)(2) (permitting schools and schools systems to develop "terms and conditions" for receipt of transferring students).

Even after the focus of scrutiny is narrowed to these specific provisions, a legitimate state purpose for § 16-6D-8(b)(8) and (d)(1) is readily apparent. In Alabama, as in most states, resources for education, not to mention other state-provided services, are scarce. As Defendants put it, "any disparity in the reach of [the AAA's] provisions is due. . . to sheer necessity, given limited public and private resources." (Doc. # 31, at 38.) It is conceivably rational that the Legislature purposed not to burden schools or school systems with the expense of enrolling, educating, and transporting students seeking escape from non-system schools designated as failing by the AAA. The transportation and enrollment provisions in the AAA furthered its purpose of not saddling nonfailing schools with the expense of admitting, educating, and transporting additional students. The court should not overturn "[s]ocial and economic legislation" like the AAA "unless the [law's] varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only

conclude that the [L]egislature's actions were irrational." *Kadrmas*, 487 U.S. at 462–63.[24]  Plaintiffs fail to carry their burden to show the law's irrationality and "to negative every conceivable basis that might support" the AAA and its challenged provisions. *Heller*, 509 U.S. at 320; *see also Kadrmas*, 487 U.S. at 463 (placing the burden of overcoming the presumption of rationality on the person challenging legislation).

The court has already determined that Plaintiffs lack standing to protest the diversion of education funds to grant tax credits to families transferring to nonpublic schools and to taxpayers who make donations to scholarship granting organizations. *See supra* Section IV.A.1.a.ii.  But assuming that Plaintiffs have standing to challenge this aspect of the AAA, the State's redirecting of state funds is rationally related to the Legislature's express dual purposes of providing all students in failing schools with the flexibility to leave their assigned, failing schools and holding failing schools accountable for the poor quality of education that the Legislature has defined as failing.  A dispute with the Legislature's policy choice and the means of the policy's implementation is due to be resolved at the ballot box.

---

[24] In *Kadrmas*, the Supreme Court applied rational basis scrutiny to a North Dakota statute that allowed some school districts, mostly in rural parts of the state, to charge families for public school bus transportation.  The Court held that the law did not violate the Equal Protection Clause and that there was a rational basis for the state's transportation scheme.  487 U.S. at 465.

### 3.   *Summary*

The shortcomings of public education in places like Alabama's Black Belt are likely as real as Plaintiffs have alleged.  The shortcomings of the AAA are also manifest.  Plaintiffs' attorneys are commended for their efforts to ensure that their clients receive an education superior to the one they currently receive in schools the State has deemed failing.  But in the absence of discrimination against a suspect class or interference with a defined, constitutional right, the AAA is entitled to this court's deferential review.

As the Supreme Court explained in *Rodriguez*, "every [state] reform that benefits some more than others may be criticized for what it fails to accomplish.  But . . . it [is] plain that, in substance, the thrust of the [AAA] is affirmative and reformatory, and, therefore, should be scrutinized under judicial principles sensitive to the nature of [Alabama's] efforts" to improve the quality of education available to its children.  411 U.S. at 39; *see also Nordlinger*, 505 U.S. at 10 ("As a general rule, legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." (internal quotation marks omitted)).  Because Plaintiffs cannot properly identify themselves as discrete victims of unconstitutional treatment, and because Plaintiffs have not alleged facts sufficient to overcome the presumption that any distinction or classification created by the AAA is rationally related to legitimate state

interests, Plaintiffs' complaint is due to be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for Plaintiffs' failure to state an equal protection claim upon which relief can be granted.

## V.  CONCLUSION

On the basis of the foregoing analysis, it is ORDERED that Defendants' motion to dismiss (Doc. # 26) is GRANTED.

A separate final judgment will be entered.

DONE this 8th day of April, 2014.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE
